**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CASE NUMBER 4:18-CR-00197-MAC-CAN |
| | § | |
| | § | |
| HAYDEN RICKS(1) | | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Pending before the Court is Defendant Hayden Ricks's Motion to Suppress [Dkt. 23]. On March 19, 2019, the undersigned conducted a full evidentiary hearing and heard argument from both the Government and Defendant on the pending Motion to Suppress. After considering the Motion, all relevant filings and evidence, as well as the argument presented at hearing, the Court recommends that Defendant's Motion to Suppress [Dkt. 23] be **DENIED**.

**BACKGROUND**

## I.    THE INDICTMENT

On October 10, 2018, Defendant was indicted for a violation of 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography) [Dkt. 1]. Count One charges that:

> Between on or about August 23, 2018, and on or about September 13, 2018, in the Eastern District of Texas, [Defendant] did knowingly possess and did knowingly access with intent to view material, namely, an iPhone 8 cellular phone, model A1905 and bearing IMEI number 359496089174087, that contained images of child pornography, as defined in Title 18, United States Code, Section 2256(8), involving a prepubescent minor and a minor who had not attained 12 years of age, that had been shipped and transported using any means and facility of interstate and foreign commerce; that had been shipped and transported in and affecting interstate and foreign commerce by any means, including by compute; and that had been produced using materials that had been mailed and shipped and transported in and affecting interstate and foreign commerce by any means, including by computer. . . . In violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2).

[Dkt. 1 at 1-2].

## II.    THE MOTION TO SUPPRESS

On March 4, 2019, Defendant filed the instant Motion to Suppress, seeking suppression of: "(1) the interview/interrogation of the Defendant that was conducted by law enforcement officers on or about September 13, 2018, at the Collin County Courthouse and any and all information obtained therefrom, including passwords or passcodes and all recordings either audio or video made of the interview itself; [and] (2) any and all evidence obtained or derived from the search of the Defendant's cell phone conducted by law enforcement pursuant to a search warrant which required the use of the illegally obtained passwords or passcodes" [Dkt. 23 at 1-2].    The Government filed a Response on March 12, 2019 [Dkt. 26]. The Court set Defendant's Motion for Hearing.  At Hearing, on March 19, 2019, the Government put on Investigator Christopher Meehan and admitted one exhibit.[1]  Defendant testified and also admitted one exhibit at Hearing.[2]

The underlying facts relevant to Defendant's Motion to Suppress are summarized as set forth below.

## III.    STATE COURT ADJUDICATION AND DEFENDANT'S SUPERVISION

In July 2012, Defendant was originally indicted with a violation of Texas Penal Code § 43.26(a) (Possession Promotion of Child Pornography).  On March 13, 2013, the 366th District Court in Collin County, Texas placed Defendant on community supervision for a period of five (5) years and ordered Defendant's adjudication to be deferred.  After several described difficulties with his community supervision, Defendant's supervision was extended and as a result, Defendant remained under supervision in September 2018.  On or about September 13, 2018, the Defendant

---

[1] Government's Exhibit One is the footage taken from Investigator Meehan's body camera, worn during the interview of Defendant.  This exhibit was shown and admitted during the hearing, but the exhibit was not tendered to the Court, and instead remained in the Government's possession.  Upon agreement of the Parties, the Court instead accepted tender of Defendant's Exhibit One.

[2] Defendant's Exhibit One is the audio from the body camera recording from Investigator Meehan's body camera, worn during the interview of Defendant.  This exhibit does not contain any images.

had a scheduled visit with his probation officer and a court appearance at the Collin County Courthouse in connection with his state case for possession of child pornography.  Defendant first reported to his supervising probation officer.  During such visit, the probation officer looked at Defendant's cellular phone, observing internet history searches regarding pornography involving "young" or "teen" boys, and purported images of child pornography, specifically underage nude males.  A term of Defendant's deferred adjudication reads: "you will. . . allow inspection by any law enforcement agent, Collin County CSCD or its designee of your computer files, digital cameras, cell phones, and removable storage media.  Submit to internet, e-mail, and other electronic transfer of information monitoring at your own expense, as directed by the Supervision Officer.  Abide by all monitoring rules, and do not tamper with or attempt to disable the monitoring program" [Dkt 26-1 at 2].  The probation officer asked Defendant about the search history, but did not ask or otherwise inquire about the images of suspected child pornography.  After Defendant left, the officer called Collin County Sheriff's Office Investigator Lanier, and advised what he observed on Defendant's phone and notified Lanier that Defendant was present at the Collin County Courthouse located near the Sheriff's Office.  Lanier and Collin County Sheriff's Office Investigator Christopher Meehan, and FBI Special Agent Jennifer Mullican, dressed in plain clothes, immediately walked to the courthouse, which is in close physical proximity to the Sheriff's Office.  Meehan, not having previously interacted with Defendant or having any other knowledge of Defendant save for the aforementioned phone conversation with the probation officer, asked the court bailiff to point out Defendant.  Investigator Meehan testified that the bailiff told Meehan that Defendant had just left the courtroom, but that she would contact Defendant and ask him to return [Dkt. 30 at 29-31].  In the meantime, Meehan secured one of the conference rooms located outside of the courtroom.

Defendant testified that after he left the courtroom, he was waiting for his ride from the courthouse when he received a call from Mr. Shapiro's office that he needed to return to the courtroom because of a clerical error in the court's paperwork [Dkt. 30 at 61-62]. Defendant returned to the courtroom, where instead of being presented with any paperwork to sign, he testified that encountered Meehan, Lanier, and Mullican. Meehan asked Defendant if he would be willing to speak with them, to which Defendant agreed. The three officers, Defendant, and Defendant's (small) dog then walked into the conference room.

## IV.    DEFENDANT'S INTERVIEW STATEMENTS AND PURPORTED CONSENT

The entire interview was recorded on Meehan's body camera. It is undisputed that Defendant was not provided any *Miranda* warnings. The interaction lasted around 20 minutes. Defendant is shown sitting around a table with the officers. The door to the conference room was not locked; in fact, during the interview, the conference is interrupted at least twice by individuals seeking to use the room or speak with Defendant. Investigator Meehan and Defendant both testified that to reach the door to exit the room, Defendant, who chose his seat, would have to pass one of the officers [Dkt. 30 at 16, 35-36 64-65]. During the interview, Defendant was not handcuffed and was not touched by any of the three officers. Meehan testified that his purpose in speaking to Defendant was to investigate the information provided to him by Defendant's probation officer and to determine if the images on the phone were images of child pornography, as individuals untrained in internet crimes against children often incorrectly believe images to constitute child pornography [Dkt. 30 at 28-29].

Upon entering the room, Meehan asked Defendant if he had visited his probation officer that day and whether his probation officer had asked to look at his phone; after answering both questions in the affirmative, without prompting from the officers, Defendant began to discuss the

search history on his phone and tell the officers that his brother searched for the pornographic images on a different device that is connected to his phone.  When asked if Meehan may look through his phone, Defendant handed his unlocked phone to Meehan [Dkt. 30 at 20-21].   In Defendant's view, Meehan proceeded to look through the images on the phone.  While Meehan searched through the phone, finding images of child pornography (which are clearly visible and readily identifiable on the bodycam footage), Mullican and Lanier casually discussed Defendant's dog, as well as Defendant's supervision and counseling.

Meehan showed certain of the pornographic images found on the phone to Defendant and asked Defendant again where the images came from; when Defendant persisted in his assertion that his teenaged brother obtained such images, Meehan informed Defendant that they were going to pull his brother out of his high school class and question him regarding the images.  Meehan also pointed out that the images on the phone were deleted from the device and were not located in a device-sharing drive.  Defendant then stated that he struggled with an addiction to prescription medication, and sometimes looked at images like those located on his phone, but that he was working through these issues with his therapist.

Approximately 14 minutes into the interview, attorney Todd Shapiro entered the conference room, stating he represented Defendant on pending state charges.  Meehan testified that he was wholly unaware that Defendant had an attorney, and was surprised when Shapiro represented himself as such given that Defendant was on probation [Dkt. 30 at 22].  Notably, per review of the body camera footage, at no point during the interview did Defendant notify the officers that he was represented by counsel.  In fact, Shapiro, upon his entry to the room, asked Defendant if had advised the officers he had counsel, to which Defendant responded no, and Shapiro then further inquired numerous times why Defendant did not tell the officers that he had

an attorney.  Meehan explained the call from the probation officer about images on the phone.  When asked by Shapiro whether Defendant was under arrest, Meehan replied that he was "still looking," and testified at Hearing that he intended to speak with the brother and wanted to take a closer look at some of the photos [Dkt. 30 at 26].  Shapiro requested that if Defendant was to be arrested, that officers first seek an arrest warrant and allow Defendant to turn himself in.  Meehan then advised that he would take the phone, to which Shapiro responded "fine," and then Meehan stated they were done talking with Defendant.  Shapiro thereafter left the room, closing the door behind him, and Meehan concluded by asking Defendant about his biographical information and medical condition and advised that because of the images on the device, Defendant would not be allowed to take his phone.  After Meehan opened the conference room door, Mullican then further asked Defendant for his iTunes login information (specifically, an email address); Defendant provided that information.  To reiterate, Defendant was not advised of his *Miranda* rights during the interview.  Defendant was not arrested at the conclusion of the interview and was allowed to leave without his phone.  Meehan provided Defendant with his business card, and after helping Defendant locate Shapiro, the officers and Defendant parted ways.  Later that afternoon, Defendant independently contacted Meehan via telephone and took responsibility for the search history and pornographic photos, advising that that such images were not his brother's as he had earlier represented.

## ANALYSIS

Defendant's Motion seeks the suppression of his interview statements and the contents of the search of Defendant's cell phone.  Defendant argues that "[t]he statements obtained as the result of the custodial interrogation of the Defendant on or about September 13, 2018 should be suppressed as being in violation of the Defendant's due process rights, his right against self-

incrimination, and his right to counsel as set out in the Fifth and Sixth Amendments to the United

States Constitution" [Dkt. 23 at 3], and "although the officers obtained a search warrant to conduct

a search of the Defendant's phone, they were unable to open the phone to access any digital

information without the illegally obtained password or passcode and, as such, any and all evidence

obtained either directly or indirectly as a result of the unlawful interrogation of the Defendant, as

set out above, must be suppressed as 'fruit of the poisonous tree'" [Dkt. 23 at 5].

## I.    THE FOURTH AMENDMENT FRAMEWORK AND THE SUPPRESSION REMEDY

The Fourth Amendment protects the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

The exclusionary rule, which permits criminal defendants to seek exclusion (suppression) of

evidence obtained through "illegal search and seizure[,]" provides one vehicle through which

citizens may "effectuate [this] Fourth Amendment right." *United States v. Calandra*, 414 U.S.

338, 347 (1974) (noting that this rule "applies as well to the fruits of the illegally seized evidence").

The U.S. Supreme Court has characterized exclusion through suppression for decades as an

"extreme sanction" that courts should apply only sparingly. *United States v. Leon*, 468 U.S. 897,

926 (1984); *see also Herring v. United States*, 555 U.S. 135, 141 (2009) (warning that application

of the exclusionary rule exacts "substantial social costs") (citations and internal quotations

omitted); *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence, however, has

always been our last resort, not our first impulse.").

"Persons accused of crimes are protected from forced self-incrimination." *United States v.*

*Burnette*, 535 F. Supp. 2d 772, 782 (E.D. Tex. 2007), *report and recommendation adopted* (Jan.

31, 2008) (citing U.S. Const. amend. V ("No person. . . shall be compelled in any criminal case to

be a witness against himself")).    "Moreover, once adversary judicial proceedings are initiated,

accused persons are entitled to assistance of counsel for their defense." *Id.* (citing U.S. Const. amend. VI ("[T]he accused shall. . . have the assistance of counsel for his defense."); *Kirby v. Illinois,* 406 U.S. 682, 688 (1972)). "In *Miranda,* the court held that one's privilege against self-incrimination applies during all stages of criminal proceedings, *including the investigation phase.* Moreover, the court concluded that confessions given in response to law enforcement interrogation while in custody are presumptively the result of coercion, and therefore inadmissible in the prosecution's case in chief." *Id.* at 783 (emphasis in original) (citing *Miranda,* 384 U.S. at 467; *United States v. Patane,* 542 U.S. 630, 631 (2004)).

"To rebut that presumption and preserve the evidence's potential utility at trial, government officials must employ procedural safeguards effective to secure the privilege against self-incrimination when they interrogate defendants or suspects in their custody." *Id.* "In such circumstances, a government official must provide the suspect or accused certain advice and warnings, including the right to remain silent, consequences of making incriminating statements and the right to consult with legal counsel." *Id.* (citing *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977); *Miranda,* 384 U.S. at 470). "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda,* 384 U.S. at 444.

## II.  DEFENDANT'S INTERVIEW STATEMENTS

Defendant contends that he did not provide a knowing, voluntary, and intelligent waiver of his rights, as is required by *Miranda,* prior to giving his interview statements and consent to search his cell phone.

"Since the entitlements referred to colloquially as *Miranda* rights attach only when a person is both in *custody* and under *interrogation,* it is important that the court define those critical terms. *Miranda* defined custodial interrogation generally as meaning 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise *deprived of his freedom of action in any significant way*." *Burnette*, 535 F. Supp. 2d at 783 (emphasis in original) (quoting *Miranda,* 384 U.S. at 444). "The determination of whether or not a person is in custody depends on how a 'reasonable person in the suspect's situation would perceive his circumstances.'" *Id*. (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 662 (2004)). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id*. (quoting *Stansbury v. California,* 511 U.S. 318, 323 (1994)). "An objective reasonableness inquiry has two general components: (1) what were the circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person have felt that they could terminate the questioning and leave." *Id*. (citing *Thompson v. Keohane,* 516 U.S. 99, 112 (1995); *State v. Pomeroy,* 713 So.2d 642, 645 (5th Cir. 1998)). "[T]he 'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant." *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (quoting *Stansbury v. California,* 511 U.S. 318, 323 (1994))). "The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *Id*. (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988).

The Fifth Circuit has identified certain factors to be considered regarding whether an individual is in custody for *Miranda* purposes:

> Important factors include: (1) **the length of the questioning**, [*United States v. Harrell,* 894 F.2d 120, 124 (5th Cir. 1990)] ("[W]e reject the broad proposition that a short delay constitutes *per se* a noncustodial interrogation or that an hour-long delay constitutes a *per se* custodial interrogation. It is but one, albeit important, factor to consider in applying our objective standard outlined in *Bengivenga*."); (2) **the location of the questioning**, *see Bengivenga,* 845 F.2d at 599 (emphasizing that the questioning took place "only a short distance" from where the defendants had been, in a location that was not isolated and subjected agents to "public scrutiny"); *Harrell,* 894 F.2d at 125 (holding defendant not in custody where the interrogation took place in "glass conference area" that was "in close proximity to the immigration checkpoint"); (3) **the accusatory, or non-accusatory, nature of the questioning**, *see Bengivenga,* 845 F.2d at 597 n. 16 ("The *awareness* of the person being questioned by an officer that he has become the 'focal point' of the investigation, or that the police already have ample cause to arrest him, may well lead him *to conclude, as a reasonable person,* that he is not free to leave" (citation omitted)); *United States v. Chavira,* 614 F.3d 127, 133–34 (5th Cir. 2010) (emphasizing that the officers told the defendant that "they knew she was not telling the truth"); (4) **the amount of restraint on the individual's physical movement**, [*United States v. Cavazos,* 668 F.3d 190, 194 (5th Cir. 2012)] (pointing out that defendant was "followed and monitored" when he tried to go to the bathroom); *Chavira,* 614 F.3d at 134 (holding that defendant was in custody where her "freedom of movement was severely restrained" by officers when they confiscated her birth certificate and ID and handcuffed her to a chair); (5) **statements made by officers regarding the individual's freedom to move or leave**, *see Cavazos,* 668 F.3d at 195 (finding officers' statements that interview was "non-custodial" relevant but not determinative and explaining that such statements should be "analyzed for their effect on a reasonable person's perception, and weighed against opposing facts"); *United States v. McNair,* 444 F. App'x 769, 770 (5th Cir. 2011) (relying heavily on the fact that officers told the defendant that "he was not under arrest" and was "free to leave" to support a finding that interrogation was non-custodial).

*Wright*, 777 F.3d at 775. (emphasis added).

Defendant argues that:

> Defendant was in custody as he was taken to a room in the Courthouse in which the door was closed, he was questioned in the presence of several law enforcement officers, he had to surrender his phone to the officers, he was not able to communicate with either his attorney or family, he was not told that he was free to leave, he was confronted with what the officers indicated was evidence of his guilt, and was told that the questioning would be helpful to him and that they were

> interested in the Defendant's ongoing treatment for any issues associated with state charge involving child pornography, and that he needed to be truthful in his responses to the officers' questions. It also appears that the officers knew that the Defendant had counsel but was never told that he could communicate with his attorney. Clearly, under these circumstances a reasonable person would not have felt that they were at liberty to terminate the interrogation and leave.

[Dkt. 23 at 3-4]. The Government responds that "[r]eviewing the totality of the circumstances against the factors evidencing custody, [Defendant] was not 'in custody' for *Miranda* purposes during his interview with the officers" [Dkt. 26 at 4]. Specifically, the Government addressed the above-enumerated factors, and argued: (1) "the officers' entire interaction with [Defendant] lasted approximately 20 minutes and the officers spoke with [Defendant] for 15 minutes of that time;" (2) "[Defendant] spoke to the officers in a public place: a conference room outside of an active courtroom in the Collin County court complex;" (3) "the exchange was cordial and conversational. No voices were raised, and the officers did not berate, badger or otherwise accuse [Defendant]. Indeed, [Defendant] drove much of the conversation, including spontaneously offering additional information. The officers wore street clothes and no one displayed their weapons;" (4) at "no time was [Defendant] ever handcuffed or restrained in any way;" and (5) "during the 15 minute interview, none of the officers told [Defendant] that he was under arrest or that he was not free to leave. Indeed, [Defendant] agreed to go into the conference room with the officers. Meehan and Mullican made references to the next steps in their investigation, including leaving [Defendant] and going to speak with his teenage brother. When Shapiro arrived, Meehan stated that [Defendant] was not under arrest and that their investigation was ongoing. And, importantly, within a matter of minutes, all of the parties left the conference room and Meehan told [Defendant] that they would help him find Shapiro in order to get a ride home" [Dkt. 26 at 6-7].

Based on the totality of the circumstances, the Court finds that Defendant was not in custody when he was interviewed by the officers, and therefore, was not required to be apprised of his *Miranda* rights.

The interaction between the officers and Defendant occurred over a span of less than twenty minutes in a public setting with no physical restraint on Defendant's freedom of movement. Indeed, after introducing himself, Meehan asked Defendant whether he was willing to talk with the officers in the conference room located off the courtroom; he did not force Defendant into the conference room, handcuff Defendant, or tell Defendant that he was under arrest or threaten him in any manner. Upon entering the conference room, Defendant was free to choose his seat; he was not led to a certain chair and ordered to sit. The seat that Defendant chose required him to walk past one of the officers, whose back was to the door, in order to exit the room. Furthermore, although the door to the conference room was closed, it was not locked—in fact, the interview was interrupted by other individuals seeking either to use the room or to speak with Defendant. At no point during the interview did the officers brandish their weapons, and further each of the officers were dressed in plain clothes. Meehan's first questions to Defendant were to confirm that Defendant had just checked in with his probation officer and his probation officer looked at his phone. Defendant then began to volunteer information regarding the phone's contents, blaming his teenaged brother for the images located on the device. Without any prompting, Defendant also disclosed that he was in counseling and was previously abused as a child. When Meehan asked if he could take a look at Defendant's phone, Defendant did not hesitate in stating yes and handing his unlocked phone to Meehan. Throughout the conversation, everyone in the room remained calm and spoke politely. Although the officers directed pointed questions to Defendant regarding the images on the phone, a significant portion of the conversation between the group involved a

friendly discussion of Defendant's dog.  Again, the entirety of the conversation was conducted in an open and friendly tone, and Defendant actively participated.  The questions directed to Defendant regarding the phone were focused on whether he was aware of these images on the device and why he believed such images to be attributable to his brother.  "[T]he [recording] of the interview, and the cooperative tone throughout, highlights that the conversation was as much an opportunity taken by [Defendant] to tell his story to the officers as it was an opportunity taken by the officers to get information from [Defendant]." *Wright*, 777 F.3d at 777.  Moreover, contrary to Defendant's argument, when Defendant's attorney, Shapiro, entered the conference room, it is clear that the officers were previously unaware that Defendant had counsel; a fact confirmed by Shapiro's own questions and statements to his client; and further, Meehan specifically advised Shapiro that Defendant was not under arrest and that their investigation was ongoing as he was "still looking."

No reasonable person in Defendant's position, after the brief questioning, would have believed that his freedom was so restrained that he was in custody for purposes of *Miranda*.  Even if Defendant was not specifically told that he was "free to leave," there is nothing to suggest that he was prevented or in any way precluded from leaving and certainly at the conclusion of the interview Defendant did depart. Therefore, taking into consideration the totality of the circumstances, the Court finds Defendant's statements were voluntarily made and not the result of a custodial interrogation.[3] *See United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006) ("With

---

[3] Further, to a point made at Hearing that Defendant returned to the courtroom due to his being deceived by the courtroom bailiff, Meehan testified at Hearing that he was wholly unaware that the bailiff used any kind of deception to ask Defendant to return to the courtroom where the officers were waiting for him.  The Court found this testimony credible and does not find that the false impetus for Defendant's return to the courtroom (to sign a different form) negates his willingness to talk with the officers outside of the courtroom or turns this interaction into a custodial interrogation.  Moreover, Defendant appeared to understand why the officers wanted to speak with him as he quickly sought to explain the source of the images as his brother before being asked any specific questions about the images or search history.

respect to the first interview, Courtney voluntarily agreed to meet with the agents at a location of her choice, a public restaurant. She was not told that she was not free to leave, nor was she told that she had to meet with the agents. The agents did not display their weapons, they were not in uniform, and at the end of the interview, Courtney left. As for the second interview, Courtney was at her place of employment. Again, however, she was not told that she had to cooperate or grant an interview, she was not told that she could not leave, and she was allowed to continue conducting business. On the facts presented here, Courtney was not in custody during either interview because a reasonable person would not have believed her freedom was restricted to the degree associated with a formal arrest.").

In addition to the aforementioned *Miranda* arguments, Defendant further argues that "after indicating to the Defendant and his attorney that no further interrogation would be carried out, the officers asked the Defendant to supply them with his passwords or passcodes[4] to enable access to his phone and the information contained therein. The continued questioning of the Defendant was not only in violation of *Miranda* and his Fifth Amendment right against self-incrimination, but also in violation of his Fifth Amendment right to counsel,. . . and his Sixth Amendment right to counsel. At the very least, the Due Process clause would be violated if the interrogating officers could tell the Defendant and his attorney that further questioning would cease, but then, once the attorney leaves, continue to carry out further questioning" [Dkt. 23 at 4].

As to the implication that the officers violated Defendant's Sixth Amendment rights, the Government responds that "on September 13, 2018, [Defendant] appeared before his supervising officer as a condition of his prior possession of child pornography conviction. However, that case

---

[4] As discussed more fully *infra*, per the Court's review of the audio, Defendant was not asked for any information that would unlock his phone after Shapiro left the conference room; and, it is clear that during the interview and prior to Shapiro entering the conference room, Meehan was able to access Defendant's device because Defendant handed his unlocked phone to Meehan, giving him full access to the device.

had been litigated years earlier. It is true that on September 13, 2018 Todd Shapiro was [Defendant's] counsel, but that was for an entirely separate, distinct, and new charge. . . Thus, even if the officers were aware of the new charge against Ricks or his representation on that charge. . . the officers would not have violated [Defendant's] rights in speaking with him about [Defendant's] current possession of child pornography" [Dkt. 26 at 7-8].    Indeed, as the Government contends, the "the Sixth Amendment only applies to the specific offense with which the suspect has been charged," and therefore, because Defendant was not then-charged with that specific instance of possession of child pornography, whether Shapiro represented him on other matters is inconsequential to whether Defendant's Sixth Amendment rights were violated by any purported continued questioning.  *United States v. Carpenter*, 963 F.2d 736, 739 (5th Cir. 1992) ("the invocation of the Sixth Amendment right to counsel, which attaches only after the initiation of adversary judicial criminal proceedings, does not amount to a *per se* invocation of the Fifth Amendment right to have counsel present during custodial interrogations about uncharged offenses") (internal quotation marks omitted).  Against this backdrop, the Court finds there was no violation of Defendant's Sixth Amendment rights.

However, "[u]nlike the Sixth Amendment right to counsel, which applies only to the charged offense, the Fifth Amendment right to the assistance of counsel during custodial interrogations is not offense-specific." *Id*.  "Once a suspect indicates that he wants the assistance of counsel during a custodial interrogation—a constitutional right guaranteed to him by the Fifth (not Sixth) Amendment, [*Miranda,* 384 U.S. 436]—law enforcement officers may not approach the suspect to interrogate him about the subject offense, [*Edwards v. Arizona,* 451 U.S. 477, 482–84 (1981)], or any other offense. [*Arizona v. Roberson,* 486 U.S. 675, 681–83 (1988)]." *Id*.  "But a suspect must expressly invoke the Fifth Amendment shield.  This the suspect can do by

communicating his preference not to be interrogated without first receiving the assistance of counsel." *Id*.

It is clear that when Defendant's attorney, Shapiro, entered the conference room that the officers were unaware that Defendant had counsel and that no invocation of any such right to counsel had been made. The Court does not find that Defendant invoked his Fifth Amendment right to counsel prior to Shapiro's arrival. The video clearly shows that Defendant did not (at any time) make any representation to the officers that he was represented by counsel or wanted counsel present during the interview. Meehan testified at Hearing that he was surprised when Shapiro walked into the conference room and represented himself as Defendant's counsel [Dkt. 30 at 22]. And relevant herein, Defendant had consented to the search of the phone prior to Shapiro's entrance and the illegal images had already been observed and recorded on the bodycam footage prior to Shapiro's entrance.

To the implication that the officers violated Defendant's Fifth Amendment rights by continuing to speak to Defendant following their interaction with Shapiro, the Government responds that "[Defendant] has not established that he was subjected to a custodial interrogation. Moreover, he did not expressly invoke either his Fifth [] Amendment rights. The closest he can argue is that, upon Shapiro's appearance, the officers agreed not to ask him any further substantive questions about his efforts to obtain child pornography" [Dkt. 26 at 8]. Indeed, as discussed *supra*, at no time before or after Shapiro's entrance into the conference room was Defendant subjected to a custodial interrogation, nor did he himself at any time indicate he desired the assistance of counsel, and therefore, the completion of the discussion with the officers under the specific facts herein does not constitute a violation of Defendant's Fifth Amendment rights. *Brown v. Smith*, CV WDQ-06-1696, 2007 WL 9735470, at *6 (D. Md. Oct. 29, 2007) ("The right against self-

incrimination is one that must be asserted in a custodial interrogation.").  The Court expressly notes that after Shapiro departed, Defendant himself still did not invoke his right to counsel and the questions posed to Defendant were limited in both time and scope, encompassing only his biographical information (i.e. how to locate him), his medical (seizure) condition which required his dog to be present with him, his iTunes login information, and the status of Shapiro's representation of him.  Defendant's behavior after Shapiro's departure still does not demonstrate an invocation of his Fifth Amendment rights.   Because *Defendant* did not invoke his Fifth Amendment right to counsel, the Court does not find that such right was violated by the officers. [5]

*See Textron Fin. Corp. v. Eddy's Trailer Sales Inc.*, CV082289 JFB AKT, 2010 WL 1270182, at *3 (E.D.N.Y. Mar. 31, 2010) ("In all seven instances, Gouldsbury himself did not invoke the privilege. Rather, it was his attorney who asserted it on his behalf and instructed him not to answer.  It is well established that the Fifth Amendment privilege against self-incrimination is a personal right. Thus, if Gouldsbury believed that a truthful answer was incriminating, he was required to invoke the right himself; 'counsel is not entitled to instruct [him] not answer on that ground.'") (citing *Calvo v. Donelli,* No. 06–CV–1794, 2007 WL 1288098, at *14 (E.D.N.Y. Apr. 30, 2007) (quoting *Couch v. United States,* 409 U.S. 322, 3281(1978) (the privilege "adheres basically to the person, not to information that may incriminate him"); *Pal v. New York Univ.,* No. 06 Civ. 5892, 2007 WL 4358463, at *10 (S.D.N.Y. Dec. 10, 2007); *United States v. Schmidt,* 816 F.2d 1477, 1481 n. 3 (10th Cir. 1987) (only holders of Fifth Amendment privilege,

---

[5] Defendant also argues that upon securing a search warrant, law enforcement was "unable to open the phone to access any digital information without the illegally obtained password or passcode," referring to Mullican's question(s) regarding Defendant's iTunes login and password posed after Shapiro's departure.  However, the bodycam footage clearly demonstrates that Defendant hands his *unlocked* phone to Meehan, allowing him full access of the device prior to Mullican's inquiry and/or Shapiro's arrival [Dkt. 30 at 42].  In any event, Defendant's phone would not be unlocked by his iTunes login and password.  Instead, Defendant's phone, if protected, would be unlocked by a passcode and/or fingerprint; the video of Defendant's interview does not reflect that Defendant was ever asked for his passcode to open the phone, rather Defendant provided the phone unlocked to law enforcement and law enforcement was then able to memorialize through the bodycam the illegal images Defendant was in possession of.

"not their counsel, are the proper parties to interpose a claim of privilege"); *United States v. Bowe,* 698 F.2d 560, 565 (2d Cir. 1983) ("the witness herself must assert the claim that answers to questions might reasonably implicate her in a crime or provide evidence leading to proof of criminal behavior"); *United States v. A & P Arora, Ltd.,* 46 F.3d 1152, 1995 WL 18276, at *3 n. 4 (10th Cir. Jan. 18, 1995) (declining to consider Fifth Amendment claims because "a statement of counsel's 'advice' is obviously not the equivalent of a party's personal and affirmative invocation of the privilege")); *see also United States v. Casseus,* 06-CR-832 (DLI), 2007 WL 4029497, at *4 (E.D.N.Y. Nov. 15, 2007) ("Defendant asserts that the police knew that he was represented by counsel and knew that counsel was at the police station waiting to speak to him. There is no evidence, however, of the defendant ever requesting counsel at any point during his discussion with the police. He signed the *Miranda* card, which documented his willingness to answer questions without a lawyer present.  Even if the defendant is correct in asserting that the police had knowledge that counsel was waiting to speak to him at the station house, this fact cannot substitute for the requirement that the defendant himself must invoke his right to counsel."); *United States v. Ivanson,* 05-CR-113 DLI, 2007 WL 680782, at *6–7 (E.D.N.Y. Mar. 2, 2007) ("the court finds that whether or not [law enforcement] was aware that [defense counsel] had called and requested that [defendant] not be interrogated without counsel is irrelevant to the outcome of the motion. The Supreme Court has stated that 'the privilege against compulsory self-incrimination is. . . a personal one that can only be invoked by the individual whose testimony is being compelled.'") (quoting *Moran v. Burbine*, 475 U.S. 412, 443 n. 4 (1986)); *Gutierrez v. Stephens*, 1:09-CV-22, 2013 WL 12092544, at *22 (S.D. Tex. Oct. 3, 2013) ("The record does not support Gutierrez's allegation that the police were present when Gutierrez allegedly asked his wife to secure legal counsel. Even assuming that Gutierrez did ask his wife to hire an attorney, the right

to counsel was Gutierrez's own; at any time during questioning he could have exerted his rights and stopped talking to the police.").

## III.   DEFENDANT'S CONSENT

Defendant further argues that "although the officers obtained a search warrant to conduct a search of the Defendant's phone, they were unable to open the phone to access any digital information without the illegally obtained password or passcode and, as such, any and all evidence obtained either directly or indirectly as a result of the unlawful interrogation of the Defendant, as set out above, must be suppressed as 'fruit of the poisonous tree'" [Dkt. 23 at 5]. The Government counters that "[w]hile the government continues to assert that the officers' interview of [Defendant] was entirely lawful, even were the Court to find otherwise, *Miranda* warnings are not required to validate a consent search. This is because a statement granting 'consent to search. . . is neither testimonial nor communicative in the Fifth Amendment sense.' Thus, the question is whether [Defendant's] consent to allow Meehan to look at his cell phone was voluntary" [Dkt. 26 at 9-10] (internal citations omitted).

The Supreme Court has held that "a warrant is generally required before [] a search [of a cellphone], even when a cell phone is seized incident to arrest." *Riley v. California*, 134 S. Ct. 2473, 2493 (2014) ("Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant."); *see also Stephenson v. Davis*, 4:16-CV-263-O, 2018 WL 1210556, at *5 (N.D. Tex. Mar. 8, 2018) ("It was not until *Riley* was issued in 2014 that it became clearly established (at least in the Fifth Circuit) that warrantless searches of cell phones violated the Fourth Amendment."). However, consent may serve as the basis for a warrantless search of a cell phone. *United States v. Escamilla*, 852 F.3d 474, 483 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 336 (2017). "To determine whether a person's

consent is voluntary, we consider six factors: (1) the voluntariness of the suspect's custodial status; (2) the presence of coercive police procedures; (3) the nature and extent of the suspect's cooperation; (4) the suspect's awareness of his right to refuse consent; (5) the suspect's education and intelligence; and (6) the suspect's belief that no incriminating evidence will be found." *Id*. (citing *United States v. Macias*, 658 F.3d 509, 523 (5th Cir. 2011)). No single factor is dispositive. *United States v. Tedford*, 875 F.2d 446, 451-52 (5th Cir. 1989). "[T]he Government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *United States v. Macias*, 658 F.3d 509, 523 (5th Cir. 2011) (internal quotation marks omitted); *see also United States v. Mata*, 517 F.3d 279, 291 (5th Cir. 2008).

With regard to the factor analysis, the Government contends:

Here, [Defendant] met with the officers in a public place. He was not handcuffed or physically restrained in any way. There were no "threats of violence" or "overt display[s] of authority." [Defendant's] entire encounter with the officers was cooperative, marked by [Defendant] volunteering information and electing to physically hand Meehan his cell phone. While the officers did not advise [Defendant] of his right to refuse consent, the Fifth Circuit has held that a defendant "need not be informed specifically of his Fourth Amendment rights" to voluntarily consent to a search. Throughout [Defendant's] conversation with the officers, he appeared to understand the questions posed to him and to provide cogent, articulated responses. Moreover, [Defendant's] statements evidenced an understanding of digital technologies. And further, having previously been prosecuted of a criminal offense, [Defendant] was "not unfamiliar with the criminal justice system." Finally, [Defendant's] eventual admission that he deleted the images and Internet history on his cell phone is evidence of his belief that the officers would be unable to find any contraband on the device.

[Dkt. 26 at 11] (internal citations omitted).

As to the first factor, the voluntariness of the suspect's custodial status, the Court finds that this factor weighs in favor of finding Defendant consented. "Custody" can be defined as either formal arrest or restraint tantamount to arrest. *See United States v. Trejo*, 378 F. App'x 441, 447-49 (5th Cir. 2010). As discussed more in depth *supra*, Meehan and the other officers asked

Defendant if he was willing to speak with them, and when he agreed, they invited him into a conference room off the courtroom; further, Defendant was not handcuffed or otherwise restrained. *United States v. Castellano-Acosta*, 2:18-CR-272, 2018 WL 3416436, at *5 (S.D. Tex. July 13, 2018) (citing *United States v. Tedford*, 875 F.2d 446, 452 (5th Cir. 1989) (defendant who was handcuffed to a chair voluntarily consented to search)).

As to the second factor, the presence of coercive police procedures, the Court finds that this factor weighs in favor of finding Defendant consented. "[T]he mere presence of armed officers does not render a situation coercive." *Escamilla*, 852 F.3d at 484 (citing *United States v. Martinez*, 410 F. App'x 759, 764 (5th Cir. 2011); *United States v. Mata*, 517 F.3d 279, 291 (5th Cir. 2008) (finding no coercion when "police did not have their weapons drawn")). There is no evidence that Meehan or any of the other officers involved in interviewing Defendant in any way threatened Defendant. The video of the interview demonstrates that Meehan and the other officers spoke calmly and in a non-threatening manner to Defendant, that none of the officers used any force against Defendant, Defendant was not physically restrained prior or during the request for consent, and law enforcement officers' firearms remained holstered during the encounter with Defendant. *Escamilla*, 852 F.3d at 483–84 (citing *Mata*, 517 F.3d at 291 (finding voluntary consent when "no officer threatened or yelled at [the defendant] or 'treated him rudely'"); *United States v. Tompkins*, 130 F.3d 117, 122 (5th Cir. 1997) (emphasizing that officers did not use threats, violence, or "overt[ly] display [their] authority")).

As to the third factor, the nature and extent of the suspect's cooperation, the Court finds that this factor weighs in favor of finding Defendant consented. The video taken of Defendant's interview shows that Defendant cooperated with law enforcement. When asked whether Meehan could look at his cell phone, Defendant expressly consented and handed his unlocked cell phone

to Meehan.  *See Escamilla*, 852 F.3d at 484 ("Escamilla's conduct here constitutes more than mere silence or failure to object—he actively complied with Agent Garcia's request by handing the phone directly to him.") (citing *United States v. Cooper*, 43 F.3d 140, 148 (5th Cir. 1995) (finding "clear cooperation" when a defendant "produced his ticket when requested" and "stood up voluntarily prior to the pat-down")).

As to the fourth factor, the suspect's awareness of his right to refuse consent, the Court finds that this factor weighs in favor of finding Defendant consented.  In the video, Defendant was not informed that he could refuse to provide consent to the search of his cell phone.  Even so, "officers' failure to advise an individual of the right to withhold consent is not determinative in and of itself."  *Escamilla*, 852 F.3d at 484 (citing *United States v. Martinez*, 410 F. App'x 759, 764 (5th Cir. 2011)).  Also, in the video, Defendant is asked whether it is a term of his probation that any member of law enforcement can search his phone; Defendant replied that he was unaware whether there was such a term in his probation agreement, but avers that he would never have a reason not to consent to such a search.

As to the fifth factor, the suspect's education and intelligence, the Court finds that this factor weighs in favor of finding Defendant consented.  With regard to Defendant's intelligence and educational background, nothing in the record suggests that Defendant is weak minded or in any way lacks the ability to consent voluntarily.  *See id*.  In fact, Defendant has an associate's degree in psychology and even described himself, at Hearing, as intelligent.

As to the sixth factor, the suspect's belief that no incriminating evidence will be found, the Court finds that this factor weighs in favor of finding Defendant consented.  Defendant maintained through the majority of the interview (and certainly those moments prior to consenting to Meehan's search of the phone) that the images on the phone were attributable to his brother and

only ended on his device as a result of cloud-sharing, and never equivocally admitted that the images are actually attributable to him. Prior to handing his phone to Meehan, Defendant stated that the images were certainly his brother's images because Defendant knew he was visiting his probation officer that day and would have deleted such images from his device prior to such meeting if he had knowledge of them. *See United States v. Olivier–Becerill*, 861 F.2d 424, 426 (5th Cir. 1988) ("[Defendant] was cooperative during the search,. . . apparently secure in the knowledge that. . . the inspection of the trunk would disclose nothing.").

Finally, to Defendant's assertion that he only cooperated in entering the conference room and turned over his phone because he was nervous, this is not enough to make his consent involuntary. A person can give a valid and voluntary consent to a search while feeling scared or nervous. *See United States v. Galberth*, 846 F.2d 983, 985, 988, 990 (5th Cir. 1988) (finding consent to search person and bags was voluntary when defendant was "very nervous," "appeared 'scared,'" and was "shaking"). And, a defendant's "nervousness" does not "preclude a finding of voluntariness in light of all the other facts and circumstances involved in [the] case." *Id.* at 988.

On balance, the Court finds that the factors weigh in favor of finding that Defendant consented to the search of his cell phone.

Furthermore, Defendant's argument that his consent was invalid because he was not properly apprised of his rights beforehand is meritless. "[T]here is no '*Miranda* requirement' attending a simple request for permission to search." *United States v. Escamilla*, 852 F.3d 474, 483 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 336 (2017) (quoting *United States v. Arias-Robles*, 477 F.3d 245, 250 (5th Cir. 2007)). Consider in *Venegas*, the Fifth Circuit rejected an identical argument, i.e., that "the district court should not have admitted the cell phone data into evidence because Deputy Villegas did not read him his *Miranda* rights prior to searching the phone." *United*

*States v. Venegas*, 594 F. App'x 822, 827 (5th Cir. 2014). Specifically, the Fifth Circuit upheld the district court's decision that "[e]ven if Deputy Villegas obtained Venegas's consent while Venegas was in custody, however, '*Miranda* warnings are not required to validate a consent search.' This is because '[a] statement granting "consent to a search. . . is neither testimonial nor communicative in the Fifth Amendment sense."'" *Id*. Accordingly, whether or not Defendant was properly given his *Miranda* warnings is irrelevant to whether he consented to the search of his cell phone.

## IV.    PROBATION TERM PERMITTING LAW ENFORCEMENT SEARCH OF PHONE

As a final matter, the Court notes that Defendant agreed to a term of his deferred adjudication allowing any law enforcement to inspect his phone.[6] Specifically, the term reads that: "you will. . . allow inspection by any law enforcement agent, Collin County CSCD or its designee of your computer files, digital cameras, cell phones, and removable storage media. Submit to internet, e-mail, and other electronic transfer of information monitoring at your own expense, as directed by the Supervision Officer. Abide by all monitoring rules, and do not tamper with or attempt to disable the monitoring program" [Dkt 26-1 at 2]. Although Defendant testified that he was unaware of the implications of this provision on his ability to decline Meehan's request to inspect his phone, the record shows that Defendant agreed to this term in exchange for the deferred adjudication of his prior possession of child pornography charge [Dkt. 30 at 68-70].

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends Defendant Hayden Ricks's Motion to Suppress [Dkt. 23] be **DENIED**.

---

[6] On March 21, 2019, the Government confirmed that this term of Defendant's deferred adjudication was in effect during Defendant's interview with the officers [Dkt. 29].

As the Parties agreed, within eight days after entry of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 28th day of March, 2019.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE